Michigan Furniture Co., Inc., Plaintiff, v. Southern Pacific Company, Defendant.

Municipal Court of New York, Borough of Manhattan, Seventh District, March 18, 1936.

*Max Weinman*, for the plaintiff.

*George L. Buland, Charles L. Minor* and *Jeremiah C. Waterman* [*Jeremiah C. Waterman* of counsel], for the defendant.

Lewis (David C.), J. The plaintiff moves for judgment on the pleadings pursuant to section 91 of the Municipal Court Code on the ground that the defendant's answer and affirmative defense are insufficient in law and that there is no defense to the action.

The defendant by cross-motion seeks a judgment on the pleadings dismissing the complaint.

No issues of fact, only questions of law, are presented.

On November 19, 1934, a garnishee was issued out of this court in favor of the plaintiff as the judgment creditor against the earnings and wages of one Cliff Simmons, a longshoreman in the employ of the defendant. The defendant refused to honor the garnishee execution, and thereupon this action was instituted against it pursuant to subdivision 3 of section 684 of the Civil Practice Act.

It is the defendant's claim that under Federal law (U. S. Code, tit. 46, § 601, commonly known as the LaFollette Act) the earnings of Cliff Simmons as a longshoreman have been and are exempt from garnishment. By this act the United States Congress, among other things, provided: " Attachment or arrestment of wages; * * *. No wages due or accruing to any *seaman or apprentice* shall be subject to attachment or arrestment from any court, and every payment of wages to a seaman or apprentice shall be valid in law, notwithstanding any previous sale or assignment of wages or

of any attachment, encumbrance, or arrestment thereon; and no assignment or sale of wages or of salvage made prior to the accruing thereof shall bind the party making the same, except such allotments as are authorized by this chapter. This section shall apply to fishermen employed on fishing vessels, as well as to seamen." (Italics mine.)

Does this exemption apply to the compensation of a longshoreman employed to stow cargo in and discharge cargo from the holds of the defendant's coastwise steamships while lying in the Hudson river in the navigable waters of the United States docked at defendant's piers in the city of New York?

It is the understanding of Congress that passed this law that controls this court. Congress has the power to legislate; the court the duty to interpret. It is not disputed that Congress had the authority to protect the pay of the longshoreman. In the maritime realm, Congress has exclusive jurisdiction. Here the problem is not one of jurisdiction. The question is whether Congress exercised its authority. The answer hangs on the judicial translation of the congressional intent. In discovering or determining the intent, we should not confine the meaning of the word ". seaman " to any narrow single definition. To do so is tantamount to a decree allowing words to conceal rather than to express our meaning. This is not the practice of our day. We do not pay homage to any word idol. Free understanding should not fear the indictment of judicial apostasy. One notes we are not dealing with any specially well-defined restricted class segregated out of the larger group; though even in such an instance one cannot be sure of the legal definition which a learned court may give to common words. (*Haggerty* v. *City of New York,* 267 N. Y. 252.)

In this particular instance we are dealing with a term applied to all ranks and grades of the men of an ancient following. Whether he be on the bridge or in the boiler room, pilot or stoker, the men of the sea are all seamen. Reading the judicial interpretation of the term " seaman " as used in the Federal Code (more particularly in connection with the Jones Act), we find that it is the nature, not the name of the job, that counts; that if the character of the work to be done is maritime, then the person doing it is engaged in maritime work, and the contract to do it is a maritime contract, and the transaction falls within the Federal jurisdiction, and without the State sovereignty.

" The court said that the work of a stevedore in which the deceased was engaged was maritime in its nature, his employment was a maritime contract and that the injuries which he received were likewise maritime." (*Matter of Heaney* v. *Carlin Constr. Co.,* 269 N. Y. 93.)

If a stevedore or longshoreman lived on the boat and worked in the body of the ship, loading and unloading cargo, it could not be denied that he came within the term "seaman." Yet the place where he may live is not determinative of the question. The determining factors are what is his work and where does he labor.

"In determining whether a contract be of a maritime nature, locality is not controlling, since the true test is the subject matter of the contract — the nature and character of the work to be done." (*Matter of Heaney* v. *Carlin Constr. Co.*, *supra*.)

It would follow that if the longshoreman is a seaman, the pay which he receives becomes the wages of a seaman; and it is the wages of a seaman, not the seaman, that the Federal statute exempts. It is his wages and not any other of his property that is exempt. So whether he work a day or a year or a lifetime, it is not the duration of his toil, but the fact that his wages are the pay for his services as a seaman that is to be considered.

The courts have been frequently called upon to interpret this term "seaman" used in the Jones Act. In doing so they have considered the definition set forth in section 713 of title 46 of the United States Code. They have uniformly held that a longshoreman is a seaman. (*International Stevedoring Co.* v. *Haverty*, 272 U. S. 50; *Buzynski* v. *Luckenbach S. S. Co.*, 277 id. 226; *Jamison* v. *Encarnacion*, 281 id. 635; *Uravic* v. *Jarka Co.*, 282 id. 234.)

The courts have explicitly held that loading and stowing a cargo on ship is a maritime service, that it involves the safety of the ship; that it is a service formerly performed by members of the crew, but that the exigencies of increasing commerce demanded the specialized service which has devolved upon a class as clearly identified with maritime affairs as are the mariners. (*Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52, 61.)

The term "seaman" is a flexible term, and, in applying it to a longshoreman, the courts have considered that "the work upon which plaintiff was engaged was a maritime service formerly rendered by the ship's crew." (*International Stevedoring Co.* v. *Haverty*, *supra*, p. 52.)

The State courts have likewise adopted a liberal policy in connection with the Jones Act, and have extended it to other employees beside the longshoreman. (*DeGetano* v. *Merritt & Chapman D. & W. Co.*, 203 App. Div. 259; *Resigno* v. *Jarka Co., Inc.*, 248 N. Y. 225; *Matter of Sells* v. *Marine Garage, Inc.*, 247 App. Div. ——; *Matter of Comr. Taxation & Finance* v. *Marine Garage, Inc.*, Id. ——.)

The Jones Act simply provided the same protection for seamen as that enjoyed by railroad men in the way of workmen's compensa-

tion. The LaFollette Act has to do with the exemption of their wages. However, the United States Code contains only one definition for the same term used in both acts; and I do not believe there is a necessity for any difference in the interpretation or application of the term. Plaintiff lays stress upon the fact that the LaFollette Act aimed at an entirely different objective originated out of an entirely different motive, and refers to the eloquent remarks of the distinguished Senator from Wisconsin. (See 64th Congress, 1st Session, Senate Document No. 333; also 63d Congress, 3d Session, chap. 163, pp. 4815, 4816 of Congressional Record.)

It may well be that the impositions practiced upon seamen was an approximate cause inducing the enactment of this law, yet I imagine that man's physical sustenance was the original setting that induced such legislation; that it was inspired by the idea that as man must earn his bread by the sweat of his brow, it is only natural to protect his right to the bread so earned against unfair dissipation so far as it might be consistent with the principles of our democracy. This is not such a strange notion, for I see no fatal conflict with established principles in giving to the earnings of the wage earner the same immunity which for many years was extended to the earnings of a spendthrift trust. To say the least, it is a justified simile; the equity behind one is equal to the other. (25 C. J. p. 8.)

Respected opinion encourages this belief. " The purpose underlying all exemption legislation is the securing to the unfortunate debtor of the means to support himself and his family." For exemption statutes invite a liberal rather than a strict interpretation. (*The Amelia*, 183 Fed. 899; *Hickman* v. *Hanover*, 33 F. [2d] 873, 874; *Hills* v. *Joseph*, 229 Fed. 865, 869.)

Counsel for the plaintiff has referred to the decision in *Jackman Sons, Inc.*, v. *Hauffman* (159 Misc. ——, Nov. 2, 1935), holding that a pilot engaged solely in work in New York harbor and the Hudson river is a seaman, " but his wages are subject to be garnisheed, as the LaFollette Act exemption is *expressly* made inapplicable to him." (Italics mine.)

It will be found, however, that the Appellate Division of our Department has decided to the contrary. (*Manufacturers Trust Co.* v. *Anderson*, 241 App. Div. 843.)

Here again one finds added evidence of the intent of Congress to make its act all-inclusive. Originally the Federal law did not include fishermen and seamen engaged in coastwise navigation. I think that when Congress by the 1915 amendment eliminated the original exception of fishermen and coastwise navigation, and

expressly included them in the act, it took all navigation within the Federal jurisdiction under its wing. And if a pilot is a seaman, and a fisherman a seaman, where is the sanction to exclude the longshoreman?

Does the pilot actually go to sea? Is not his voyage practically confined within the horizon? True, he may labor entirely on board the vessel and his trips may take him to the sea; however, he usually lives on land. And to come within the admiralty law a gangplank from the boat to the pier will, if the stream is navigable, invoke the jurisdiction of admiralty. (*The Admiral Peoples*, 295 U. S. 649.)

Likewise the fisherman may go to sea to land his catch, but his home port is his port of leave and call. His excursions need not touch alien shores nor cover long periods; his trips may be short in time as well as in distance, yet he comes within the act.

The inclusion of coastwise navigation excludes the distinction between domestic and foreign navigation.

For these reasons I do not believe the distinction urged by the plaintiff, to wit, that the longshoreman may be considered what in common parlance is called a landlubber because he resides on land, necessarily excludes him from the protection of the statute.

Consonant with the liberal interpretation which the courts have given to the term "seaman," and for the reasons set forth, I have concluded that a longshoreman comes within the protection of the LaFollette Act, and for that reason the plaintiff's motion should be denied and defendant's motion granted. Ten days' stay.

The excellent briefs submitted by counsel bear testimony of their painstaking efforts; they merit most favorable comment. This court is pleased to express and record that fact.